IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES E. OSBY,<br><br>        Plaintiff,<br><br>   v.<br><br>JOHN E. POTTER,<br><br>        Defendant.<br>_____/ | No. C 06-01732 CRB<br><br>**MEMORANDUM AND ORDER RE:**<br><br>**CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

    Charles E. Osby, an African-American, Muslim man, is employed by the United States Postal Service ("USPS"). He brought this civil action under Title VII of the Civil Rights Act of 1964, claiming that the USPS subjected him to a hostile working environment and unlawfully discriminated against him. For the reasons set forth below, Defendant's motion for summary judgment is hereby GRANTED, and Plaintiff's cross-motion for summary judgment is hereby DENIED.

**BACKGROUND**

    Osby was hired by the Postal Service in February of 2001 to work as a custodial laborer in the main branch of the Oakland post office. He claims that he has been routinely subjected to demeaning and discriminatory treatment at the USPS since then. His complaint in this case, however, rests on two specific incidents of allegedly discriminatory treatment.

//

First, Osby claims that he was subjected to discriminatory treatment as the result of an incident that occurred in April of 2005. In this incident, three postal employees complained to one of Osby's supervisors that he was using a dirty mop to clean a drinking fountain and that he had placed the mop upside down in a trash can, allowing water to spill onto the floor and thereby creating a safety hazard. This supervisor, Elsie Ambeau, relayed these concerns to another supervisor, Donnell Covington, who approached Osby about the incident. A conversation ensued in which Ms. Ambeau repeated her understanding about what had happened. Osby denied that he had used a dirty rag or mop to clean the water fountain, though he recognized that some water had dripped onto the floor. The supervisor communicated his hope that Osby would not use dirty objects to clean the water fountain and instructed Osby to clean the water off the floor. No further action was taken by the USPS in response to the incident. Osby maintains that he never used a dirty rag or mop to clean the drinking fountain and insists that these charges were made against him out of hostility to his race, religion, and sex.

Second, in May of 2005 Mr. Osby discovered that the initials "KKK" had been etched into his USPS timecard. Osby does not know who defaced the timecard and has been unable to identify a suspect. The USPS took numerous actions in direct response to this incident. Osby's supervisors reported the incident to the Postal Police and the Postal Inspector, who conducted an investigation. The USPS investigator, however, determined that the etching was too indistinct to determine who had made it, and concluded that a handwriting analysis would not help to identify the perpetrator among the thousands of postal employees who had access to the timecards. Osby's supervisors further responded to the incident by giving "stand-up talks" to all maintenance employees who worked with Osby. These talks emphasized the USPS's policy against discrimination and communicated to the employees that acts such as vandalizing Osby's timecard constituted grounds for dismissal. Finally, the USPS installed security cameras at the timecard station where the incident occurred.

Following these incidents, which occurred within two months of each other, Osby filed a grievance with the Equal Employment Opportunity Commission ("EEOC"). The

EEOC dismissed the grievance, finding that Osby had failed to allege a "direct, personal deprivation at the hands of [his] employer." In other words, the EEOC found that Osby had failed to allege sufficient injury or harm as a result of the two incidents.

Osby then filed an administrative appeal with the Office of Federal Operations. As to the first incident regarding the cleaning of the water fountain, the Commission affirmed that Osby had failed to state a claim for discrimination, finding that Osby failed to identify how the USPS had harmed or injured him. As to the second incident regarding the defaced timecard, however, the Commission reversed the dismissal of his grievance. The Commission found that the incident "was sufficiently severe to alter the conditions of his employment and state a claim of harassment." Thus, as to this second incident, the Commission remanded Osby's grievance for further processing. In accordance with the Commission's rules, however, it also gave Osby the option of pursuing an appeal in federal district court. Osby elected to forego remand proceedings and pursue his claim in this Court, filing a complaint on March 7, 2006.

In his complaint, Osby renews his claims that the USPS has discriminated against him and subjected him to a hostile workplace. In addition to the two incidents described above, his complaint also identifies several additional incidents that occurred at his workplace:

(1) In 2002, Osby became aware that there were certain errors in his personnel file. Specifically, the post office had incorrectly recorded that his employment began on February 24, 2002, rather than on February 24, 2001. In addition, the USPS had given him credit for four and a half years of military service, when in fact he had slightly less than four years of service. In other words, the USPS had given him too much credit for prior military service and too little credit for service as a USPS employee. Both of these dates were corrected when Osby brought the errors to the attention of the USPS.

(2) At some point in 2002, Osby became aware that he was scheduled to be transferred to a postal facility in Emeryville, California. According to Osby, he learned of the pending transfer a week before it went into effect. Osby claims that he objected to the transfer, but that his immediate supervisors were set on transferring him. When Osby approached the senior manager of the custodial department, she looked into his records and discovered that he had in fact requested to work at only the Oakland facility. The USPS then rescinded its decision to transfer him.

(3) Osby claims that he frequently wears what he describes as "middle-eastern clothing" in connection with his "faith and culture" as a Muslim. The complaint recounts an incident in 2003 when a supervisor approached him and "flipped" his clothing sarcastically, asking Osby what the clothing was

3

"supposed to mean." Osby explained to the supervisor that the clothing was connected to his faith as a Muslim and walked away.

(4) At some point in or around July of 2003, Osby was involved in an altercation at the Oakland post office with a supervisor named Mr. Thomas. Apparently, Osby and Mr. Thomas had previously attempted to fix a leaky toilet together, with Osby making the repairs under Mr. Thomas' supervision. Several days later, Osby claims he was called to the bathroom by a Mr. Thomas, who was angry and accosted Osby with a monkey wrench. Osby walked out of the bathroom, which prompted Mr. Thomas to accuse him of insubordination. Osby brought the incident to the attention of his manager, who instructed Osby to return to work and promised to look into the matter. Subsequently, a meeting took place between Osby and Mr. Thomas, together with a union representative. At the end of the discussion, Osby and Mr. Thomas shook hands. Osby states that "[t]he matter was resolved but there was an injustice done to me."

(5) In September of 2003, Osby suffered an on-the-job injury. He subsequently sought medical treatment for the injury and submitted paperwork to the USPS regarding the injury. Osby claims that one of his supervisors attempted to pressure him into completing a "duty status report" that should have been completed by his physician instead. According to Osby, he refused to fill out the form and could have been punished criminally if he had complied with his supervisor's suggestion to do so without his physician's aid.

(6) In November of 2004, Osby's wife, who is also a custodial employee at the Oakland post office, was in her third trimester of pregnancy. Osby claims that her superiors assigned her to do a "double route" cleaning nine restrooms and four break rooms. Osby complained to his supervisors about the length of the route, and he claims that they reacted negatively to his complaint. Osby then approached a manager about the situation. His wife was subsequently reassigned to a less strenuous route.

(7) Osby describes an incident in February of 2005 surrounding the celebration of Black History Month at the Oakland post office. According to Osby, he obtained permission to place the Quran into a display about African-American history and culture. Another postal employee wished to place a Bible in the display and ultimately received permission to do so. The Bible subsequently disappeared from the display. The other postal employee publicly and repeatedly accused Osby of removing it until a third employee came forward and confessed to having removed the Bible. According to Osby, the entire incident "caused animosity to develop[] toward myself and my honest attempt to show another side of our history and culture."

(8) Osby claims that in May of 2005 he had difficulty getting his supervisors to allow him to leave work under the Family Medical Leave Act. According to Osby, his supervisors allowed him to use all of his annual leave, but improperly refused to allow him to use his sick leave. Osby claims that he had to write to his congressional representative about the matter, and that he ultimately received permission to take additional leave after the FMLA administrators in San Jose reviewed his complaint.

Osby recognizes that these assorted incidents do not form the basis for an independent claim, either for unlawful discrimination or the creation of a hostile work environment. Moreover,

4

as the government correctly points out, Osby is barred from asserting a claim based on these incidents because he has failed to exhaust his administrative remedies with the EEOC and any attempt to do so now would be untimely. Nonetheless, Osby states that he has presented these allegations in his complaint in order to show a pattern of adverse treatment in connection with his other claims.

## DISCUSSION

A plaintiff bears the initial burden of establishing a *prima facie* case of discrimination, meaning that he must show (1) that he is a member of a protected class, (2) that he performed his work adequately, (3) that he suffered an adverse employment action, and (4) that he was treated differently from other similarly situated employees. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir. 2003); Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1113 (9th Cir.2000). Once the plaintiff meets this initial burden, the defendant must come forward with a legitimate, nondiscriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802; Leong, 347 F.3d at 1124. If the defendant articulates a legitimate justification for its treatment of the plaintiff, the burden then shifts back to the plaintiff to come forward with evidence to demonstrate that the defendant's putative justification is merely a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804; Leong, 347 F.3d at 1124.

Here, in agreement with the EEOC's decisions, the Court holds that Osby has failed to establish a *prima facie* case of discrimination. Simply put, he has failed to show that the terms of his employment have been adversely affected by any of his employer's actions. He "was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in salary or in any other benefit." Kortan, 217 F.3d at 1113. He also did not receive any negative performance evaluations and was not the subject of any formal reprimands. Indeed, the only consequence of the two incidents on which Osby's complaint rests is that his supervisor questioned him about his janitorial duties and told him that he should not use dirty objects to clean the water fountain. This type of verbal

admonition, unaccompanied by any material change in the circumstances of Osby's employment, is insufficient to establish a claim that his employer has discriminated against him in violation of federal law. It is true that the Ninth Circuit has rejected the "no harm, no foul" defense to discrimination claims, holding that even minor adverse actions can constitute a violation of federal law and that questions about the degree of harm should be left for a determination of the plaintiff's damages. See, e.g., Hashimoto v. Dalton, 118 F.3d 671, 675-76 (9th Cir. 1997). Here, however, there is neither harm *nor foul*. There was no adverse action taken at all, material or otherwise. Osby has pointed to nothing that the USPS did, or failed to do, in relation to the material terms of his employment.

Moreover, even if this Court were to assume that Osby had established a *prima facie* case of discrimination, he has presented no evidence to rebut the USPS's legitimate, nondiscriminatory justification for its treatment of him--namely, the accusation that he was using a dirty mop or rag to clean a drinking fountain, and that he had caused water to drip onto the floor, thereby creating a safety hazard. These legitimate reasons for approaching Osby about his work were confirmed by Osby himself, who has recognized that water did in fact drip onto the workroom floor. Osby has failed to set forth any evidence suggesting that his supervisor's handling of the situation--which, as noted above, resulted in no disciplinary or other adverse action against Osby--was motivated by any animus toward Osby's religion, race, or sex. Far from raising any reasonable inference that his superiors' handling of the situation was pretextual, the evidence and testimony submitted by Osby confirm that the USPS had a legitimate reason for approaching him and that their resolution of the situation was related to these legitimate concerns. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). For these reasons, a reasonable jury could not find the USPS liable on Osby claim of unlawful discrimination.

To establish a claim for hostile work environment, a plaintiff must prove that discrimination or harassment in his workplace is "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." McGinest v. GTE Service Corp., 360 F.3d 1103, 1113 (9th Cir. 2004); Steiner v. Showboat Operating Co., 25

6

1  F.3d 1459, 1463 (9th Cir. 1994); see also Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864,
2  871 (9th Cir. 2001) (stating that a plaintiff must show a "pattern of ongoing and persistent
3  harassment severe enough to alter the conditions of employment").  Yet even if a plaintiff is
4  able to prove that there has been offensive and severe harassment at his workplace, an
5  employer cannot be held liable if it "take[s] adequate remedial measures" that are
6  "reasonably calculated to end the harassment."  Star v. West, 237 F.3d 1036, 1038 (9th Cir.
7  2001) (quoting Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1482 (9th
8  Cir.1997); and Ellison v. Brady, 924 F.2d 872, 882 (9th Cir.1991)).

9       This Court assumes that the timecard incident is sufficient to establish a claim against
10 the USPS for a hostile workplace environment.  Although hostile work environment claims
11 typically "are based on the cumulative effect of individual acts," rather than isolated
12 incidents, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002), the Supreme
13 Court has never held that a severe or egregious incident, even if isolated, can never be
14 actionable.  Rather, the test is whether the conduct is "sufficiently severe or pervasive to alter
15 the conditions of the victim's employment and create an abusive working environment."
16 Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB
17 v. Vinson, 477 U.S. 57, 67 (1986)).  This Court declines to conclude that harassment by an
18 anonymous postal employee using hateful and intimidating speech, such as the symbol of the
19 Ku Klux Klan, is not sufficiently serious to give rise to a claim about the hostility of a
20 workplace environment.

21      Nonetheless, even assuming that Osby has established an actionable claim, the Court
22 concludes that the USPS is entitled to summary judgment on Osby's hostile work
23 environment claim because the undisputed evidence shows that the USPS immediately took
24 remedial measures that were calculated to end the harassment.  Star, 237 F.3d at 1038,
25 Yamaguchi, 109 F.3d at 1482; Ellison, 924 F.2d at 882.  First, it thoroughly investigated the
26 offense, employing the services of the postal police and an investigator.  Though these
27 investigations did not ultimately produce the culprit, they indicated that the USPS took the
28 harassment seriously and intended to catch and punish the wrongdoer.  Second, the USPS

installed cameras at the timecard station, a step that both ensured that any future acts of vandalism would be caught and sent a strong message to others in the workplace that their activities were being scrutinized by the management. Third, and most significantly, USPS supervisors conducted talks with all of the employees who were in close contact with Osby and indicated that the timecard incident is contrary to the USPS's anti-discrimination policy, that such behavior would not be tolerated at the Oakland facility, and that any similar acts would constitute a basis for termination. Finally, the record indicates that Osby has not suffered from any related or similar harassment since the timecard incident.[1] On this undisputed evidence, a reasonable jury could not find the USPS liable for a Title VII claim on the basis of a hostile workplace environment.

Nor do the other incidents identified in Osby's complaint provide a basis for holding the USPS liable for subjecting Osby to a hostile workplace environment. Several of these incidents--the errors in his personnel file; the aborted transfer to the Emeryville facility; the argument over the leaky faucet; his wife's "double route" during her pregnancy; and the leave he took under the FMLA--involve no discernable harassment or misconduct. These constitute garden-variety workplace disputes about scheduling and administrative matters give rise to no inference of discrimination or hostility, and in fact, each of these incidents was resolved entirely in Osby's favor. (The errors were corrected, his transfer was rescinded, the argument was resolved with a union representative, his wife's schedule was adjusted, and he took FMLA leave.) The remaining three incidents cannot be viewed as "severe or pervasive" harassment, even when viewed in conjunction with the defaced timecard. The

---

[1] In his opposition to the government's motion for summary judgment, Osby describes at length a dispute that has developed recently at the Oakland facility regarding his maintenance of a workers' break room. On several occasions, Osby has attempted to close the break room so that he can clean it. After finding the room closed, other employees became angry that they could not use the room or access their belonging during the break. According to Osby, the situation has required the intervention of several managers to resolve. In his description of these events, however, Osby still has not identified any action that the USPS has taken that has materially affected the terms of his employment, nor has he submitted any evidence that would suggest the conflict between him and the other employees regarding the break room is related to any hostility on the part of the employees or the supervisors toward Osby's race, religion, or sex. For this reason, Osby's opposition to the motion for summary judgment is insufficient to create a genuine dispute about a material fact that would require a trial on the merits.

8

first of these involved an alleged attempt by a supervisor to force Osby to complete a disability form that needed to be completed by his doctor instead. The second of these involved a comment from a different supervisor regarding the nature of Osby's "middle-eastern clothing." And the third of these involved accusations against Osby by a different employee regarding the disappearance of a Bible, and Osby was ultimately exonerated when another employee admitted to taking it. While these incidents were no doubt a nuisance to Osby, none of them involved the same actors and none of them could be viewed as related to one another. Nor is there any evidence that any of the incidents were related to the timecard incident itself. On this record, a reasonable jury could not conclude that the additional acts of which Osby now complains were sufficient to establish ongoing or continuing hostility in his workplace. Even if these assorted and unrelated incidents "'engender[ed] offensive feelings,'" they "[did] not sufficiently affect the conditions of [Osby's] employment to implicate Title VII." Harris, 510 U.S. at 21 (quoting Meritor, 477 U.S. at 67).

## CONCLUSION

The Court's decision to grant summary judgment to the USPS should not be interpreted as approving of the conduct Osby describes in his complaint. In particular, the etching on the timecard represents an abhorrent act that demands swift and certain denunciation. No employee should have to endure such intimidation and malice, much less in the employ of a federal agency, and Title VII exists precisely to ensure that a remedy is available when employers fail to remedy such wrongs. In this case, the undisputed evidence shows that the USPS shares this Court's abhorrence for the discrimination and harassment experienced by Osby, and that it took prompt action designed to prevent such incidents from recurring. On this record, therefore, the Court concludes that summary judgment is warranted on Osby's claim for hostile work environment. Further, the Court concludes that Osby has failed to demonstrate that the USPS has taken any adverse action against him or to present any evidence that even its arguably antagonistic actions are a pretext for racial or religious discrimination. For this reason, summary judgment is also warranted on Osby's

//

claim for discrimination.  Accordingly, the USPS's motion for summary judgment is hereby GRANTED, and Osby's motion for summary judgment is hereby DENIED.

**IT IS SO ORDERED.**

Dated: April 20, 2007

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2006\1732\order 1.wpd            10